## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

CODY SMOOT                                         CIVIL ACTION

VERSUS                                             NO. 17-14945

DARRELL VANNOY, WARDEN                             SECTION: "A"(3)


### REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Cody Smoot, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On August 25, 2011, Smoot was charged in the Parish of Jefferson for second degree murder.[1]  Smoot was tried before a jury on January 23 and 24, 2013, and was found guilty as charged.[2]  The court sentenced Smoot to life imprisonment at hard labor without the benefit of probation, parole or suspension of sentence.[3]  Smoot's motion to reconsider sentence was denied.[4]

---

[1] St. Rec. Vol. 1 of 8, Bill of Indictment, 8/25/11.
[2] St. Rec. Vol. 4 of 8, Jury Verdict, 1/24/13; Trial Transcript, 1/23/13; St. Rec. Vol. 5 of 8, Trial Transcript (con't), 1/23/13; Trial Transcript, 1/24/13; St. Rec. Vol. 6 of 8, Supplemental Trial Transcript, 1/24/13.
[3] St. Rec. Vol. 1 of 8, Commitment Order, 1/31/13; Sentencing Minutes, 1/31/13; St. Rec. Vol. 5 of 8, Sentencing Transcript, 1/31/13.
[4] St. Rec. Vol. 1 of 8, Motion to Reconsider Sentence, 1/31/13; Order, 2/4/13.

Smoot filed a direct appeal to the Louisiana Fifth Circuit Court of Appeal alleging that the state district court erred in denying his motion reconsider sentence and in failing to allow him the right to present a defense.[5]   The court denied petitioner's appeal on January 15, 2014.[6]   The Louisiana Supreme Court denied Smoot's writ application without stated reasons on September 12, 2014.[7]

On September 1, 2015, petitioner filed an application for post-conviction relief with the state district court in which he claimed: (1) ineffective assistance of counsel for failing to file a motion to suppress; and (2) ineffective assistance of counsel for failing to object to hearsay identification evidence.[8]   The state district court denied petitioner's application on December 3, 2015, finding petitioner failed to show that his counsel acted deficiently or any resulting prejudice.[9]   The Louisiana Fifth Circuit Court of Appeal denied petitioner's application for supervisory writ finding that petitioner failed to show prejudice as a result of his counsel's failure to file a motion to suppress and object to identification evidence.[10]   The Louisiana Supreme Court denied petitioner's application for review finding he failed to show he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668 (1984), referencing the attached state district court's written reasons.[11]

Petitioner thereafter filed the instant federal application seeking habeas corpus relief alleging the following claims: (1) excessive sentence; (2) the trial court denied him his right to

---

[5] St. Rec. Vol. 5 of 8, Appeal Brief, 2013-KA-0453, 8/12/13.
[6] State v. Smoot, 134 So. 3d 1 (La. App. 5th Cir. 2014); St. Rec. Vol. 2 of 8, 5th Cir. Order, 13-KA453, 1/15/14.
[7] State v. Smoot, 147 So.3d 704 (La. 2014); St. Rec. Vol. 2 of 8, La. S. Ct. Order, 2014-KO-0297, 9/12/14.
[8] St. Rec. Vol. 2 of 8, Application for Post-Conviction Relief, 9/1/15.
[9] St. Rec. Vol. 3 of 8, Order, 12/3/15.
[10] St. Rec. Vol. 3 of 8, 5th Cir. Order, 16-KH-41, 3/29/16.
[11] State ex rel. Smoot v. State, 225 So.3d 463 (La. 2017) (per curiam); St. Rec. Vol. 3 of 8, La. S. Ct. Order, 2016-KH-0895, 9/15/17.

present a defense; and (3) ineffective assistance of counsel in that counsel failed to (a) file a motion to suppress; and (b) object to hearsay testimony by Detective Goff.[12]

The state does not challenge the timeliness of petitioner's application. The state argues that petitioner's claims relating to excessive sentence and ineffective assistance of counsel lack merit. The state argues that petitioner's claim regarding his right to present a defense is procedurally barred.[13] Petitioner filed a traverse.[14]

## I. Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal habeas corpus legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both. The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The

---

[12] Rec. Doc. 1.
[13] Rec. Doc. 13.
[14] Rec. Doc. 14.

applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 134 S. Ct. 1697, 1706 (2014). However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully

4

constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law."  Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one."  Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so.  As the United States Supreme Court has held:

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts –

from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts.").

The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. White, 134 S. Ct. at 1701.

## II. Facts

On direct appeal, the Louisiana Fifth Circuit Court of Appeal summarized the facts of this case as follows:

> Benny Ferrell and his brother Johnny, the victim in this case, had been homeless for most of their lives and were both users of crack cocaine. In March of 2011, Benny had taken up residence in a shed behind his nephew's house. However, Johnny was not allowed to stay there because he was a nuisance in the neighborhood, often begging for money.
>
> In the early morning hours of March 29, 2011, Johnny appeared at his brother's shed with a companion. Johnny asked Benny if he could sell his boombox in order to get money to purchase crack cocaine. After Benny refused his brother's request, Johnny took the boombox from the shed and told Benny that his companion would give him a "dime rock" for it. Again, Benny refused to sell his boombox, and he put it back in the shed. Johnny's companion then began to walk off and told Johnny to "come on" in a loud, angry voice. Johnny and his companion left, and Benny returned to the shed to get some rest. Within a few minutes, Benny heard several gunshots in the area. Fearing that his brother was involved, he ran to the corner, but did not see anything. Benny returned to the shed and went to sleep.
>
> At approximately 7:00 a.m. on March 29, 2011, Officer Paul Dupuis of the Jefferson Parish Sheriff's Office was on routine patrol when he was flagged down by Eddie Deamer, who informed him that a "man was down" farther up the street. Officer Dupuis continued up the street and observed a dead body on the ground near the sidewalk in front of an empty lot located just around the corner from Benny's shed. Officer Dupuis advised headquarters and secured the scene.
>
> Detective Matthew Vazquez of the Jefferson Parish Sheriff's Office arrived on the scene and found five .40 caliber Winchester casings and a projectile fragment in the vicinity of the victim's body, as well as a projectile under the victim's body.[1] In addition, he and Detective Rhonda Goff, the lead investigator, encountered Benny who, by this time, had arrived on the scene having been alerted that his brother had been shot. Benny, who was visibly upset about his brother's death, agreed to go to the detective bureau to give a statement to the police.

[1]At trial, Dr. Susan Garcia, a forensic pathologist, testified that she performed an autopsy on the victim and determined that the manner of death was homicide and that the cause of death was multiple gunshot wounds. In addition, Deputy Jene Rauch, an expert in the field of firearm and tool mark examination, testified that the four projectiles recovered from the victim's body and the projectile recovered from under the victim's body were .40 caliber and were fired from the same weapon.

In connection with his statement, Benny described the person he last saw with his brother. A composite sketch was produced and distributed to the police districts. Detective Goff received leads concerning two different individuals, and she prepared two separate photographic lineups. When she presented these lineups to Benny, he advised her that the individual who was with his brother the morning of the shooting was not in the lineups. Thereafter, a fellow officer saw the sketch and commented that it looked like Cody Smoot. Detective Goff compiled another photographic lineup, which contained defendant's picture, and presented it to Benny on March 31, 2011. From this third photographic lineup, Benny positively identified defendant as his brother's companion in the early morning hours of March 29, 2011.

After this positive identification, Detective Goff obtained a search warrant for defendant's last known address, and on April 12, 2011, officers searched that residence. In addition, she obtained a search warrant for a white Pontiac Grand Prix, which was parked outside the residence at the time of the search. The vehicle was towed back to the detective's bureau and searched pursuant to the warrant.

Defendant was subsequently taken into custody and transported to the detective bureau for questioning. After being advised of his rights and executing a waiver of rights form, defendant gave a recorded statement. In his statement, defendant admitted ownership of some of the items found during execution of the search warrants, including the crack cocaine, the 9 mm round of ammunition, the .40 caliber rounds of ammunition, and a Glock magazine. He admitted that he intended to sell the crack, and he explained that the Grand Prix belonged to his sister, but that he had been using it for the past three or four days.

Defendant further explained that the victim was his *parran*, who "smoked a lot of crack" and that he had last seen him several months earlier on January 21, 2011. He said he learned of the victim's death around 7:00 a.m. on March 29, 2011, while at his grandfather's house on Lloyd Price Avenue. He explained he was asleep with his girlfriend Joanna Miller when he was awakened by a phone call from his cousin, Rynell Allen, informing him that the victim had been killed and to watch the news.

The detectives subsequently investigated Rynell Allen, but were unable to locate any such person. The detectives also spoke with Joanna Miller, who informed them that she was working at a McDonald's restaurant near Zephyr Field on Airline Drive that evening, that she left work around 1:00 a.m. on March 29, 2011, and that she met defendant at his grandfather's house, where they spent the night. However, Detective Goff spoke with the manager of that McDonald's, who informed the detective that a person by that name had never worked there. When Detective Goff confronted Ms. Miller with this information, she explained she made a mistake because she was scared, but had actually been working at the McDonald's on Claiborne Avenue and Louisiana Avenue in Orleans Parish.

Detective Goff determined that Ms. Miller had been fired from this McDonald's on March 17, 2011, twelve days before the murder. Subsequently, at trial, Ms. Miller explained that she was untruthful with the police because she was scared and did not want to get involved.

At trial, Ms. Miller testified that at around 1:00 a.m. that same morning, she received a telephone call from defendant, her boyfriend, who asked her to pick him up. Ms. Miller drove and picked defendant up from a trailer park near the Mark Twain apartment complex. When defendant got into the car, Ms. Miller observed that he was out of breath, "agitated, sweaty, and just didn't want to be bothered." Ms. Miller asked defendant what had happened; defendant initially did not respond, but then explained that he had shot someone.

Defendant then directed Ms. Miller to drive to her grandmother's house on Simon Street, which was uninhabited and abandoned due to a fire. When they arrived, defendant exited the car and proceeded to the back of the house and returned to the car after a few minutes. Defendant then directed Ms. Miller to go to her parents' house. When they arrived, the couple retreated to her bedroom, where Joanna's mother discovered defendant the next morning. Ms. Miller testified that she did not observe defendant with a gun that night, but acknowledged that she has seen him with a "big and bulky" gun[2] in the past.[15]

[2] At trial, Deputy Jene Rauch testified that the projectiles recovered from the victim's body exhibited signs consistent with having been fired from a hi-point firearm, which she described as "usually pretty big and bulky ... a real heavy gun.".

### III. Petitioner's Claims

### A. Excessive Sentence

Smoot, who was a juvenile at the time of the crime, claims that the trial court erred in denying his motion to reconsider sentence. He contends that his sentence violates <u>Miller v. Alabama</u>, 567 U.S. 460 (2012), and <u>Montgomery v. Louisiana</u>, 136 S. Ct. 718 (2016), because he was not given the opportunity to present mitigating factors such as the attendant qualities of youth at his sentencing hearing. He also claims his life sentence without parole is excessive.

Petitioner raised this claim on direct appeal. In the last reasoned state court judgment, the Louisiana Fifth Circuit Court of Appeal found:

In the instant case, the trial court clearly complied with the sentencing directives set forth in <u>Miller v. Alabama</u>, <u>supra</u>. At the sentencing hearing conducted on January 31, 2013, defendant argued that he should be allowed parole

[15] <u>State v. Smoot</u>, 134 So. 3d 1, 2-4 (La. App. 5th Cir. 2014); St. Rec. Vol. 3 of 8, 5th Cir. Order, 13-KA-453, pp. 3-6, 1/15/14.

eligibility pursuant to the principles set forth in <u>Miller</u>.  Citing studies about the intellectual ability, psychological development, and reasoning processes of adolescents, defense counsel suggested to the court that defendant, who was 17 at the time of the crime, "did not possess the full reasoning capabilities of an adult in his early twenties; that he would have been more prone to be influenced by risk taking and sensation thinking."  Defense counsel then advised the court that defendant came from a broken home; that he was raised primarily by his grandfather; that between the ages of 12 and 15, defendant was placed in group homes and Boys Town; and that during that three-year time period, he was treated by psychiatrists, psychologists, and counselors.  Defense counsel then asked the court to take these factors into consideration and fashion a sentence that would afford defendant at least the opportunity for parole.

The State then articulated that it took no position as to sentencing; however, the prosecutor then discussed the principles of <u>Miller</u> and reviewed the factors set forth in LSA-C.Cr.P. arts. 894.1 and 905.5 that should be taken into consideration in the imposition of sentence. In particular, the State noted that "this was an elderly victim, who had HIV, who was homeless, was crack addicted, and was shot multiple times, in the front and in the back."  The State stressed that a firearm was used, that the murder occurred as a result of defendant's involvement in the drug trade, and that a sentence of life with parole would deprecate the seriousness of the matter.  The State also informed the trial judge that defendant was presently serving a sentence for his conviction for possession with intent to distribute cocaine.  In addition, defendant has a prior arrest for second degree murder, but the charge was refused because the witnesses failed to come forward to testify.  The State also discussed the mitigating factors and found the only applicable one under the circumstances of this case to be the youth of the offender.  In discussing this factor, the State stressed that defendant was 17 years old at the time of the offense and noted that under Louisiana law, a 17-year-old can receive adult consequences.

After hearing extensive argument from both sides, the trial court articulated its considerations before imposing sentence, specifically noting that it had read <u>Miller</u> and the other applicable cases.  The trial court stated that it had taken into account the youth of defendant as well as his upbringing and previous criminal activity.  Despite defendant's youth, the court found that defendant preyed upon a particularly vulnerable individual who was a homeless, HIV positive drug addict.[5] Further, the court also expressed astonishment that defendant shot this victim multiple times over a stereo.

[5]Although the trial court specifies that the victim was HIV positive, this fact was not confirmed by any evidence.

The court then meticulously considered the sentencing guidelines as provided in LSA-C.Cr.P. art. 894.1.  From the fact that a bullet was located underneath the victim's body, the court reasoned that defendant had shot the victim while he was incapacitated on the ground, shooting him "like a dog."  The court found this conduct demonstrated that defendant had "so little value [for] life" and exhibited a deliberate cruelty to the victim.  Finally, the court contemplated the statutory mitigating circumstances for capital sentencing as provided in LSA-C.Cr.P. art. 905.5, finding no applicable circumstances other than defendant's youth.

      In the instant case, it is clear that the trial court complied with the principles set forth in <u>Miller</u> prior to imposing sentence. He considered mitigating factors and particularly took defendant's youth into account before imposing a sentence of life imprisonment without benefit of parole. Accordingly, we find no error in the trial court's denial of defendant's motion to reconsider sentence. The arguments raised by defendant in this assigned error are without merit.[16]

The Louisiana Supreme Court denied writs without stated reasons.[17]

      The United States Supreme Court in <u>Miller v. v. Alabama</u>, 567 U.S. 460 (2012), held that criminal sentences of "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " <u>Id.</u> at 465. The <u>Miller</u> Court stated that mandatory life sentences "by their nature, preclude a sentence from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." <u>Id.</u> at 476. <u>Miller</u> stated that it did not foreclose a sentencer's ability to impose a life sentence, but the sentencer must take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison. The Court opined that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." <u>Id.</u> at 479. <u>Miller</u> explained, "[o]ur decision ... mandates only that a sentencer follow a certain process -- considering an offender's youth and attendant characteristics -- before imposing a particular penalty." <u>Id.</u> at 483.

      In <u>Montgomery v. Louisiana</u>, 136 S. Ct. 718 (2016), the Supreme Court held that <u>Miller</u> is in fact retroactive. The Court reasoned:

      <u>Miller</u>, then, did more than require a sentencer to consider a juvenile offender's youth before imposing life without parole; it established that the penological justifications for life without parole collapse in light of "the distinctive attributes of youth." <u>Id.</u>, at ——, 132 S.Ct., at 2465. Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects " 'unfortunate yet

---

[16] <u>State v. Smoot</u>, 134 So. 3d 1, 5-7 (La. App. 5th Cir. 2014); St. Rec. Vol. 3 of 8, 5th Cir. Order, 13-KA-4535, pp. 6-11, 1/15/14.

[17] <u>State v. Smoot</u>, 147 So.3d 704 (La. 2014); St. Rec. Vol. 2 of 8, La. S. Ct. Order, 214-KO-0297, 9/12/14.

transient immaturity.' " Id., at ——, 132 S.Ct., at 2469 (quoting Roper, 543 U.S., at 573, 125 S.Ct. 1183). Because Miller determined that sentencing a child to life without parole is excessive for all but " 'the rare juvenile offender whose crime reflects irreparable corruption,' " 567 U.S., at ——, 132 S.Ct., at 2469 (quoting Roper, supra, at 573, 125 S.Ct. 1183), it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth. Penry, 492 U.S., at 330, 109 S.Ct. 2934. As a result, Miller announced a substantive rule of constitutional law. Like other substantive rules, Miller is retroactive because it " 'necessarily carr[ies] a significant risk that a defendant' " -- here, the vast majority of juvenile offenders -- " 'faces a punishment that the law cannot impose upon him.'" Schriro, 542 U.S., at 352, 124 S.Ct. 2519 (quoting Bousley v. United States, 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998)).

Montgomery, 136 S. Ct. at 734.

It is undisputed that petitioner was 17 years old at the time of the offense and was indicted prior to Miller. Petitioner, however, was convicted and sentenced approximately six months after the Miller decision. The transcript of the sentencing hearing reflects that defense counsel argued that the existence of mitigating circumstances in petitioner's case warranted a sentence of life with parole:

> MR. FLEMING [defense counsel]:
>
> ....
> Now the Supreme Court in Miller, stated that children should not be treated identically as adults. Studies have indicated that adolescents have basic intellectual abilities by age sixteen, but they still exercise poorer judgment than their adult counterparts.
> Psychological development has been found to continue into a person's early adulthood; and this development continues as a child's reasoning becomes more abstract.
> However, for a child, the concepts of what constitutes right and wrong are still seen very differently from a child as opposed to an adult.
> Also, Your Honor, it has been found that adolescents exhibit behavior which interferes with their reasoning and thinking which could account for increased risk taking and sensation thinking.
> Now patterns of brain development entered into teenage years with – with regard to that, MRIs reveal that teenagers frequently possess emotions and emotional behavior substantially different from those of their adult counterparts.

So therefore I would submit that Mr. Smoot, while at age seventeen, did not possess the full reasoning capabilities of an adult in his early twenties; that he would have been more prone to be influenced by risk taking and sensation thinking.

And finally, with regard to Mr. Smoot's personal background: he did come from a broken home; his father had legal custody of him; however, he was reared primarily by his grandfather; between the ages of twelve and fifteen, Mr. Smoot was placed in group homes, and Boys Town; and during that three year period, he was treated by psychiatrists, psychologists, and counselors.

So I would ask the Court to take into account those considerations, and to respectfully, in light of Miller versus Alabama, fashion a sentence for Mr. Smoot which would afford him at least the opportunity for parole.[18]

After hearing the arguments of the parties, the trial court stated that it had considered petitioner's youth along with his criminal activity.[19]  The transcript reflects that the court gave the following reasons for the sentence imposed in this case:

THE COURT:

….

And so I take into account that the individual who was the victim in this case, was someone who was a dependent person, who was homeless, HIV positive, who was a – an addict, a drug addict; based on all the evidence that I've heard; and basically someone who was dependent on others to help him because he could not take care of himself, you know; and in this day and age, we're supposed to help our fellow man; do whatever we can to help him.  Give them a place to live, give them food to eat, give them every opportunity to help themselves.

Well in this situation, based on the evidence that I heard, Mr. Smoot chose to be judge, jury, and executioner of this individual.  Somebody that – who he preyed on, because as a drug seller, you prey on drug users; that's how you keep your business afloat.

And I note for the record that he was seventeen years, and roughly two – two and a half months at the time this happened.

This was an individual who was older than he was, that he just took advantage of a situation and didn't like the way things went out, didn't get what he wanted, and decided that he would take matters into his own hand.

And the evidence that showed a jury – from the pathologist showed that this individual was shot multiple times, with multiple entrance and exit wounds; all over, what?  A proposed radio.  In exchange for drugs, or in exchange for some potential drugs in the future.  Now that's a world I don't understand; although I was a D.A., like Mr. Clauss, for eighteen years, I never understood it.  But it's something we have to deal with.

---

[18] St. Rec. Vol. 5 of 8, Sentencing Transcript, pp. 6-7, 1/31/13.
[19] Id., at p. 20.

So, I take into account the age, and the circumstances of his upbringing; I take into account also the criminal record of the conviction; also the refusal for another murder; I also take into account 894.1, the sentencing guidelines, which as the Court will read: under A, I believe there's an undue risk that during the period of any suspended probation or any other type sentence, that he will commit another crime, because at a young age, he's already shown the predisposition to commit crime; that the Defendant is in need of a correctional treatment or custodial environment that can only be provided most effectively by his commitment to an institution; and that any lesser sentence would deprecate the seriousness of the defendant's crime in which he took the victim's life by shooting him a multiple of times.

In which I would agree with Mr. Clauss, he was on the ground, because one of the bullets was recovered under his body. So that's an individual that's incapacitated, on his back, and someone proceeds to stand over them and shoot them down, like a dog. And I'm asked to consider mitigation for an individual that takes so little value of life, and I'm asked to give that meaning.

You know when you take another person's life, it's probably the worse [sic] thing that can ever happen to you, and the victim; because you have to live with it the rest of your life. I hope you can do that, Mr. Smoot. I don't know.

But I also take into account also because I've always read the sentencing guidelines in sentencing. So I take into account – I have already concluded by reading this, certain things that I would consider. And as Mr. Clauss pointed out, that the following grounds while will not controlling the discretion of the court shall be accorded weight in its determination of sentence. So I believe that the d. – the offender's conduct during the commission of this offense, this murder, manifested a deliberate cruelty to the victim, under B 1; and B 2, the offender knew or should have known the victim of the offense was particularly vulnerable, considering he was a consistent drug user who continued to buy from the Defendant.

And any time that you have a gun, and you shoot it down an alley, or whatever way you shoot it, you knowingly create a risk of death or great bodily harm to more than one person by discharging a firearm within city limits so that's under 5.

That the offender – that the offense resulted in significant or permanent injury or significant loss to the victim or his family; the offender used a dangerous weapon, there's no dispute on – a firearm that was used; under 10.

The offense was a controlled dangerous substance offense, and the offender obtained substantial income or resources from the ongoing drug activities. We know that, because he has a conviction for possession with intent to distribute cocaine.

And even if I were to go to 905.5 of the Code of Criminal Procedure article that pertains to capital offenses: the offender has no significant prior history of criminal offense, under A; would not apply.

The offense was committed while the offender was under the influence of extreme mental or emotional disturbance; doesn't apply.

The offense was committed while the offender was under the influence or under the domination of another person; does not apply, under C.

D, the offense was committed under circumstances which the offender reasonably believed to provide a moral justification or extenuation for his conduct; under D, would not apply.

At the time of the offense, under E, the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law, was impaired, as a result of a mental disease or a defect, or intoxication; does not apply.

F, the youth of the offender at the time of the offense would be the only thing that would apply so far.

G, the offender was a principal whose participation was relatively minor; would not apply.

And then H, any other relevant mitigating circumstance; would have to be considered.

I've taken all of that into consideration, I've taken into account that he came from a broken home, came into the account of all the circumstances.  But after considering them, with all the other evidence that I have before me, I do not find it to be compelling, in the sense of my sentencing.[20]

The trial court then sentenced petitioner to life without the benefit of parole, probation or suspension of sentence.[21]  Petitioner re-urged his arguments in a motion to reconsider sentence, which the trial court denied.[22]

The record therefore clearly demonstrates that the trial court did not impose a sentence of life of imprisonment without parole simply because that sentence was mandatory under the applicable statute.  Rather, as required by Miller, the trial court held a hearing at which the defense presented mitigating factors in support an argument that the court should deviate from the mandatory sentence.  The trial court clearly considered petitioner's youth along with multiple mitigating and aggravating factors before imposing sentence.  While the trial court did not make specific findings with regard to petitioner's capacity for change over time and did not explain how the facts of the crime were not the result of the impulsivity or immaturity of youth, the Supreme Court has not mandated such specific findings.  See Montgomery, 136 S. Ct. at 375 ("Miller did

---

[20] Id., at pp. 21-26.
[21] Id., at p. 26.
[22] St. Rec. Vol. 1 of 8, Motion to Reconsider Sentence, 1/31/13; Order, 2/4/13.

not impose a formal factfinding requirement" so as to avoid interfering with the States' administration of their criminal justice system). Thus, there was no violation of Miller. Bell v. Uribe, 748 F.3d 857, 869-70 (9th Cir. 2014) ("Because the sentencing judge did consider both mitigating and aggravating factors under a sentencing scheme that affords discretion and leniency, there is no violation of Miller."), cert. denied, DeMola v. Johnson, 135 S.Ct. 1545 (2015); Rue v. Ramos, CIV 15-CV-02669-PHX-PGR (MHB), 2017 WL 5198249, at *10-13 (D. Ariz. June 16, 2017) (states courts' decision affirming sentence was not contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States where state trial judge provided petitioner with an individualized sentencing procedure and considered his youth and attendant characteristics along with mitigating and aggravating factors before sentencing him to life imprisonment without the possibility of parole), adopted, 2017 WL 5192969 (D. Ariz. Nov. 9, 2017); Aguilar v. Ryan, No. CV-14-02513-PHX-DJH, 2016 WL 8944352, at *8-15 (D. Ariz. Sept. 1, 2016) (no violation of Miller where state trial court held a sentencing hearing at which it considered petitioner's youth and attendant characteristics along with mitigating and aggravating factors before imposing a sentence of natural life), adopted, 2017 WL 2119490 (D. Ariz. May 16, 2017).

Petitioner also claims his sentence of life imprisonment without parole is excessive. That claim has no merit for the following reasons.

To the extent petitioner challenges the state courts' compliance with Louisiana's sentencing laws and the Louisiana Constitution, such a claim is not the concern of federal habeas review. Butler v. Cain, 327 F. App'x 455, 457 (5th Cir. 2009). Instead, federal courts afford broad discretion to a state trial court's sentencing decision that falls within statutory limits. Haynes v. Butler, 825 F.2d 921, 923-24 (5th Cir. 1987); See also, Turner v. Cain, 199 F.3d 437, 1999 WL

1067559, at *3 (5th Cir. Oct. 15, 1999) (Table, text in Westlaw).  As will be discussed, the life sentence imposed upon petitioner was provided by law, and, while petitioner was not provided the benefit of parole, the sentence was not excessive.

The Constitution prohibits cruel and unusual punishments through the imposition of inherently barbaric punishments under all circumstances.  Graham v. Florida, 560 U.S. 48, 58-59 (2010) (citing Hope v. Pelzer, 536 U.S. 730 (2002)).  However, when a sentence is within a state's statutory limits, a federal habeas court will not upset the terms of the sentence unless it is shown to be grossly disproportionate to the gravity of the offense.  See Harmelin v. Michigan, 501 U.S. 957, 993-95 (1991); Solem v. Helm, 463 U.S. 277, 290-91 & n.17 (1983).  The concept of proportionality is central to the Eighth Amendment, and embodied in the Constitution's ban on cruel and unusual punishments.  Graham, 560 U.S. 59 (citing Weems v. United States, 217 U.S. 349, 367).

Under Supreme Court law, "when a threshold comparison of the crime committed to the sentence imposed leads to an inference of 'gross disproportionality,' " a court then considers (a) the sentences imposed on other criminals in the same jurisdiction; and (b) the sentences imposed for commission of the same offense in other jurisdictions.  Smallwood v. Johnson, 73 F.3d 1343, 1346-47 (5th Cir. 1996); McGruder v. Puckett, 954 F.2d 313, 316 (5th Cir. 1992).  If the sentence is not "grossly disproportionate," in the first instance, the inquiry is finished.  United States v. Gonzales, 121 F.3d 928 (5th Cir. 1997), cert. denied, 522 U.S. 1063 (1998).  As the Supreme Court has noted, outside the context of capital punishment, successful proportionality challenges are "exceedingly rare," and constitutional violations are sustained in only "extreme" or "extraordinary" cases.  Ewing v. California, 538 U.S. 11, 23-30 (2003) (citations omitted); Lockyer v. Andrade, 538 U.S. 63 (2003).  This is not such a case.

Here, as noted, petitioner was convicted of one count of second degree murder and sentenced to a term of life imprisonment without parole.  A sentence of life imprisonment was mandatory under La. Rev. Stat. § 14:30.1; however, the trial court considered the issue of parole eligibility as required by <u>Miller</u>.  In imposing the sentence, as previously discussed, the trial court considered petitioner's youth, his upbringing and prior criminal activity, the vulnerability of the victim, and the depravity surrounding the commission of the crime.  Post-<u>Miller</u>, Louisiana courts have imposed life sentences without parole upon similarly situated defendants who were juveniles at the time of the offenses and were convicted of second degree murder.  <u>State v. Dove</u>, 194 So.3d 92 (La. App. 4th Cir. 2016) (16 year old sentenced to life without parole for second degree murder), <u>writ denied</u>, 222 So. 3d 48 (La. 2017), <u>cert. denied</u>, 138 S.Ct. 1279 (2018); <u>State v. Williams</u>, 178 So.3d 1069 (La. App. 2d Cir. 2015) (17 year old sentenced to life without parole for second degree murder), <u>writ denied</u>, 209 So. 3d 790 (2016); <u>State v. Wilson</u>, 165 So.3d 1150 (La. App. 4th Cir. 2015) (17 year old sentenced to life without parole for second degree murder), <u>writ denied</u>, 191 So.3d 1035 (La. 2016); <u>State v. Fletcher</u>, 149 So. 3d 924 (La. App. 2d Cir. 2014) (15 year old sentenced to life without parole for second degree murder), <u>writ denied</u>, 171 So. 3d 945 (La. 2015), <u>cert. denied</u>, 136 S.Ct. 254 (2015).  Because the sentence is not grossly disproportionate, this Court's "inquiry is finished."  <u>Gonzales</u>, 121 F.3d at 942.

Petitioner has not demonstrated that his sentencing hearing violated <u>Miller</u> or that his sentence was disproportionate to his offense, excessive, or otherwise unconstitutional under the circumstances.  The state courts' denial of relief on this issue was not contrary to or an unreasonable application of Supreme Court law.  He is not entitled to relief on this issue.

## B. Right to Present a Defense

Petitioner claims the trial court denied him his constitutional right to present a defense when the court excluded evidence relating to an anonymous phone call alleging Benny Ferrell committed the murder. The state argues that this claim is procedurally barred. The state is correct.

The United States Fifth Circuit Court of Appeals has held:

> A claim that a state has withheld a federal right from a person in its custody may not be reviewed by a federal court if the last state court to consider that claim expressly relied on a state ground for denial of relief that is both independent of the merits of the federal claim and an adequate basis for the court's decision. To satisfy the "independent" and "adequate" requirements, the dismissal must "clearly and expressly" indicate that it rests on state grounds which bar relief, and the bar must be strictly or regularly followed by state courts, and applied to the majority of similar claims. This rule applies to state court judgments on both substantive and procedural grounds.

Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001) (citations omitted). Where a lower court has rejected a claim on procedural grounds, later opinions upholding that decision are presumed to rely on the same grounds if reasons are not assigned. Id. ("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim are presumed to rest upon the same ground."). The United States Fifth Circuit has held that "[a] state court expressly and unambiguously bases its denial of relief on a state procedural default even if it alternatively reaches the merits of a [petitioner's] claim." Fisher v. Texas, 169 F.3d 295, 300 (5th Cir. 1999).

Here, while the Louisiana Fifth Circuit Court of Appeal alternatively addressed the merits of petitioner's claim, there is no question that the court denied this claim on procedural grounds. In the last reasoned state court opinion addressing this claim, the Fifth Circuit held that the claim was procedurally defaulted, stating:

> At a pre-trial hearing, the State made an oral motion in limine seeking to exclude any reference to an anonymous call made to Crime Stoppers that claimed

Benny Ferrell was the perpetrator of the crime.[6]  At the hearing, the State asserted this evidence was inadmissible hearsay.  The defense responded that it was admissible as a res gestae exception to the hearsay rule because it was part of the police investigation.  The court granted the State's motion over the defense's objection.

[6]At trial, Detective Goff testified that Benny Ferrell was investigated and was cleared as a suspect in this case.

On appeal, defendant challenges this ruling.  He claims that this evidence, even if it was hearsay, should have been admitted pursuant to the "fairness exception," i.e., because it was reliable and necessary to his defense.

Initially, as noted by the State, defendant did not raise in the trial court the argument he now raises on appeal.  Here, defendant argues that the evidence is admissible pursuant to the "fairness exception," whereas in the trial court, defendant argued the evidence was admissible pursuant to the res gestae exception.  A defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal.  State v. Alvarez, 10–925 (La. App. 5 Cir. 6/29/11), 71 So. 3d 1079, 1085.  Accordingly, this particular argument was not properly preserved for appellate review….[23]

Without additional reasons assigned, petitioner's related writ application was then likewise denied by the Louisiana Supreme Court.[24]

In this case, the state, in its appellate brief, cited to La. Code Crim. P. art. 841 in arguing that the claim that the evidence was admissible pursuant to the "fairness exception" was not preserved for appeal.[25]  Under La. Code Crim. P. art. 841(A) "[a]n irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence."  Louisiana courts have concluded that "[a] defendant is limited to the grounds for objection that he articulated in the trial court, and a new basis for the objection may not be raised for the first time on appeal."  State v. Browning, 956 So.2d 65, 72 (La. App. 5th 2007); State v. Young, 764 So.2d 998, 1005 (La. App. 1st Cir. 2000).

---

[23] State v. Smoot, 134 So. 3d 1, 11-12 (La. App. 5th Cir. 2014); St. Rec. Vol. 2 of 8, 5th Cir. Order, 13-KA453, pp. 11-12, 1/15/14.

[24] State v. Smoot, 147 So.3d 704 (La. 2014); St. Rec. Vol. 2 of 8, La. S. Ct. Order, 214-KO-0297, 9/12/14.

[25] St. Rec. Vol. 5 of 8, Appellate Brief, 13-KA-453, p. 20, 10/7/13.

19

The Fifth Circuit did not explicitly mention La. Code Crim. P. art. 841(A) to support its finding that petitioner's claim was not preserved for appellate review. Nevertheless, the court cited to State v. Alvarez, 71 So.3d 1079, 1085 (La. App. 5th Cir. 2011), in which the court relied on La. Code Crim. P. art. 841(A) to find a claim relating to testimony had not been preserved for appellate review where the defendant did not raise a contemporaneous objection at trial. Thus, the Fifth Circuit implicitly invoked art. 841(A) in finding petitioner's claim was not properly preserved for appellate review.

The United States Fifth Circuit Court of Appeal has clearly held that Louisiana's contemporaneous objection rule is an independent and adequate state procedural rule. Duncan v. Cain, 278 F.3d 537, 541-43 (5th Cir. 2002). Therefore, "federal habeas review is barred unless the petitioner demonstrates either cause and prejudice or that a failure to address the claim will result in a fundamental miscarriage of justice." Hughes v. Johnson, 191 F.3d 607, 614 (5th Cir. 1999). In the instant case, petitioner demonstrates neither.

"To establish cause for a procedural default, there must be something external to the petitioner, something that cannot fairly be attributed to him." Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted). Objective factors that can constitute cause include interference by officials that makes compliance with the state procedural rule impracticable, a showing that the factual or legal basis for the claim was not reasonably available to counsel, and ineffective assistance of counsel. Romero v. Collins, 961 F.2d 1181, 1183 (5th Cir. 1992). Here, petitioner has not argued, much less established, cause for this procedural default. "Absent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

In that petitioner has not met the "cause and prejudice" test, this claim is barred from federal review unless the application of the procedural bar would result in a "fundamental miscarriage of justice." In order to establish that there would be a "fundamental miscarriage of justice," a petitioner must "make a persuasive showing that he is actually innocent of the charges against him. Essentially, the petitioner must show that, as a factual matter, he did not commit the crime for which he was convicted." Finley, 243 F.3d at 220 (citations omitted). However, the United States Supreme Court has cautioned:

> To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial. Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.

Schlup v. Delo, 513 U.S. 298, 324 (1995). Here, petitioner presents no new evidence whatsoever showing that he is factually innocent of the crimes of which he stands convicted, much less any evidence of the type or caliber referenced in Schlup. Moreover, ample evidence of his guilt was introduced at trial. Therefore, he has not established that any miscarriage of justice will result from the application of the procedural bar.

For these reasons, petitioner's claim that his right to present a defense was violated by the trial court when it excluded evidence of a phone call alleging Benny Ferrell was the shooter is procedurally barred and should not be considered by this Court.

## C. Ineffective Assistance of Counsel

Petitioner raises two claims of ineffective assistance of counsel in his petition. He claims that his counsel rendered constitutionally ineffective performance in failing to: (1) file a motion to suppress; and (2) object to hearsay identification testimony. Petitioner raised these claims in his

post-conviction application, and the state district court found the claims to be meritless.[26] The

Louisiana Fifth Circuit Court of Appeal denied petitioner's related writ application finding

petitioner failed to demonstrate prejudice resulting from his counsel's actions.[27] The Louisiana

Supreme Court denied petitioner's related writ application finding he failed to show he received

ineffective assistance of counsel under the standard of <u>Strickland v. Washington</u>, 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), referencing the attached state district court's written

order.[28]

Because ineffective assistance of counsel claims present mixed questions of law and fact,

this Court must defer to the state court decision rejecting such claims unless that decision was

"contrary to, or involved an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); <u>Moore v.</u>

<u>Cockrell</u>, 313 F.3d 880, 881 (5th Cir. 2002). Moreover, the United States Supreme Court has

explained that, under the AEDPA, federal habeas corpus review of an ineffective assistance of

counsel claim is in fact *doubly* deferential:

> The pivotal question is whether the state court's application of the <u>Strickland</u> standard was unreasonable. This is different from asking whether defense counsel's performance fell below <u>Strickland</u>'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). And as this Court has explained, "[E]valuating whether a

---

[26] St. Rec. Vol. 3 of 8, Trial Court Order, 7/22/15.

[27] St. Rec. Vol. 3 of 8, 5th Cir. Order, 16-KH-41, pp. 2-3, 3/29/16.

[28] <u>State ex rel. Smoot v. State</u>, 225 So.3d 463 (La. 2017) (per curiam); St. Rec. Vol. 3 of 8, La. S. Ct. Order, 2016-KH-0895, 9/15/17.

> rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid</u>. "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. ____, ____, 129 S.Ct. 1411, 1413-14, 173 L.Ed.2d 251 (2009) (internal quotation marks omitted).

<u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citation omitted). The Supreme Court then explained:

> Surmounting <u>Strickland</u>'s high bar is never an easy task. An ineffective assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the <u>Strickland</u> standard must be applied with scrupulous care, lest intrusive post-trial inquiry threaten the integrity of the very adversary process the right to counsel is meant to serve. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is all too tempting to second-guess counsel's assistance after conviction or adverse sentence. The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom.
>
> Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult. *The standards created by <u>Strickland</u> and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.* The <u>Strickland</u> standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under <u>Strickland</u> with unreasonableness under § 2254(d). *When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard.*

<u>Id.</u> at 105 (citations omitted; emphasis added). Therefore, on a habeas review of an ineffective assistance claim, "federal courts are to afford *both* the state court *and* the defense attorney the benefit of the doubt." <u>Woods v. Etherton</u>, 136 S. Ct. 1149, 1151 (2016) (emphasis added; quotation marks omitted). For the following reasons, the Court finds that, under those stringently deferential standards, it simply cannot be said that relief is warranted with respect to petitioner's ineffective assistance of counsel claims.

The clearly established federal law which governs ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984). Strickland established a two-prong test for evaluating such claims. Specifically, a petitioner seeking relief must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced his defense. Id. at 697. A petitioner bears the burden of proof on such a claim and "must demonstrate, by a preponderance of the evidence, that his counsel was ineffective." Jernigan v. Collins, 980 F.2d 292, 296 (5th Cir. 1993); see also Clark v. Johnson, 227 F.3d 273, 284 (5th Cir. 2000). If a court finds that a petitioner has made an insufficient showing as to either of the two prongs of inquiry, i.e. deficient performance or actual prejudice, it may dispose of the ineffective assistance claim without addressing the other prong. Strickland, 466 U.S. at 697.

To prevail on the deficiency prong of the Strickland test, a petitioner must demonstrate that counsel's conduct fails to meet the constitutional minimum guaranteed by the Sixth Amendment. See Styron v. Johnson, 262 F.3d 438, 450 (5th Cir. 2001). "Counsel's performance is deficient if it falls below an objective standard of reasonableness." Little v. Johnson, 162 F.3d 855, 860 (5th Cir. 1998). Analysis of counsel's performance must take into account the reasonableness of counsel's actions in light of all the circumstances. See Strickland, 466 U.S. at 689. "[I]t is necessary to 'judge ... counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'" Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) (quoting Strickland, 466 U.S. at 690). A petitioner must overcome a strong presumption that the conduct of his counsel falls within a wide range of reasonable representation. See Crockett v. McCotter, 796 F.2d 787, 791 (5th Cir. 1986); Mattheson v. King, 751 F.2d 1432, 1441 (5th Cir. 1985).

In order to prove prejudice with respect to trial counsel, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. In this context, a reasonable probability

is "a probability sufficient to undermine confidence in the outcome." Id.  In making a determination as to whether prejudice occurred, courts must review the record to determine "the relative role that the alleged trial errors played in the total context of [the] trial." Crockett, 796 F.2d at 793.

Petitioner first alleges his counsel was ineffective for failing to file a motion to suppress based on an illegal search of his residence and his vehicle.  Petitioner contends that his counsel should have challenged the search warrant of the residence because the information in the affidavit was stale and there was no nexus between the place to be searched and the property to be seized. Petitioner further contends that his counsel was ineffective for failing to argue that the search of the vehicle was illegal because it occurred prior to the issuance of the search warrant.

The state responds that the affidavit in support of the search warrant provided adequate probable cause to search the residence.  It further contends that even in the absence of adequate probable cause, suppression would have been inappropriate under the good faith exception.  The state argues that the search of the vehicle was authorized under Louisiana law.  It therefore concludes that trial counsel did not render deficient performance by declining to file a motion to suppress the search of the residence or the vehicle.

Police secured a warrant to search the residence after petitioner was positively identified by Benny Ferrell from a photographic lineup as the last individual to be seen with the victim moments before the gunshots.  The search warrant application recited, along with facts relating to the police investigation of the crime scene, that Benny Ferrell identified petitioner the day after the murder and that the residence located at 1516 Lloyd Price was petitioner's last known address.[29]

---

[29] St. Rec. Vol. 2 of 8, Application for Search Warrant, 4/8/11.

While it is not completely clear from the record, it appears that the original search of the vehicle occurred during the execution of the search warrant for the residence on April 12, 2011. At that time, detectives found a burnt end of a cigarette that tested positive for marijuana and rounds of ammunition in the vehicle.[30]  The vehicle was then towed to an evidence hanger and detectives secured a second separate search warrant to search the vehicle on April 13, 2011.[31]

The state district court in its written order, which was adopted by the Louisiana Supreme Court found:

> Petitioner first argues that counsel was ineffective for failure to file a motion to suppress the evidence found in petitioner's home and challenges the warrant. However, as the State points out in its response, the detective presented evidence to the commissioner to justify a reasonable belief that petitioner committed the crime, and that evidence of the crime could be found at the residence, especially considering that petitioner was seen leaving the residence minutes before the gunshots were heard.[32]  Upon the search, ammunition was recovered, establishing a nexus between the crime and the residence.  Probable cause was established.
>
> Furthermore, the Louisiana Supreme Court has held that as long as an officer acting in good faith reasonably believes he is providing a magistrate with sufficient information for issuance of a search warrant, suppression of evidence is not required due to a later finding of lack of probable cause.  State v. Long, 2003-KK-2592 (La. 9/9/04), 884 So. 2d 1176.  Hence, in this case, even if with insufficient probable cause, there would be no basis for a motion to suppress, and any motion would be without merit.
>
> Petitioner argues that counsel was ineffective for failure to file the motion to suppress the evidence found in petitioner's vehicle.  The [sic] finds no merit to this claim, as the officers presented evidence sufficient to establish probable cause that evidence of the crime could be found in petitioner's vehicle, and insinuates that the that the officers acted in bad faith in presenting probable cause to the magistrate. Petitioner also argues that the officers searched the vehicle prior to obtaining the search warrant.  As the State points out in its response, the Fifth Circuit Court of Appeal has held that a search warrant of a suspect's vehicle parked in front of a residence was valid pursuant to warrant authorizing the search of a residence:

---

[30] Upon questioning by detectives, petitioner advised he had recently driven the vehicle and that the .40 caliber ammunition in the vehicle that belonged to him.  St. Rec. Vol. 3 of 8, Supplemental Report by Detective Rhonda Goff #114845, p. 8, 3/29/11; Jefferson Parish Sheriff's Office Transcribed Audio Statement Form, pp. 1, 9-10, 4/12/11.

[31] St. Rec. Vol. 2 of 8, Application for Search Warrant, 4/13/11.

[32] There is no evidence supporting the state district court's statement that petitioner was seen at his residence immediately prior to the murder.  Rather, the evidence of record shows that, immediately prior to the murder, petitioner was seen with the victim at 909 Ford Street where Benny Ferrell lived.

> Based on our review of the application, the warrant and the jurisprudence, we find that defendant's argument on this issue is without merit.  Although the affidavit on which the warrant was based refers several times specifically to the Monte Carlo, the warrant itself does not refer to any vehicles.  However, a warrant authorizing the search of a particularly described premises permits the search of a vehicle located on the premises targeted for the search and subject to the authority of the warrant.  State v. Smith, 02–1842, p. 1 (La. 9/20/02), 827 So.2d 1122, 1123 (per curiam); State v. Carter, 10–973, p. 8 (La. App. 5 Cir. 8/30/11), 75 So.3d 1, 5. The rationale behind this holding is that the vehicle is capable of concealing the sought-after contraband.  Id.  Accordingly, the search of defendant's vehicle was valid pursuant to the warrant since it was parked in front of the residence which was the target of the search and which was particularly described in the warrant.  This assignment of error is without merit.

State v. Washington, 11-716 (La. App. 5 Cir. 3/13/12), 90 So.3d 1157, 1161 (La. Ct. App. 2012).  Hence any motion filed to contest the search of the vehicle would be without merit.

Petitioner fails to meet the Strickland requirements for proving ineffective assistance of counsel, as he fails to show that counsel acted deficiently, or that any prejudice resulted.[33]

A failure to file a motion to suppress evidence gained in violation of the Fourth Amendment is properly brought as an ineffective assistance claim on federal collateral review.  Kimmelman v. Morrison, 477 U.S. 365, 383-91 (1986).  Nevertheless, the "failure to file a suppression motion does not constitute per se ineffective assistance of counsel."  Id. at 384.  Rather, to succeed on such a claim, the petitioner must prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actual prejudice."  Id. at 375; accord Evans v. Davis, 875 F.3d 210, 218 (5th Cir. 2017).  Accordingly, if the evidence in question was not obtained through an illegal seizure, then a petitioner's related Sixth Amendment claim based on his counsel's failure to file a motion to suppress challenging the evidence on that basis necessarily fails.  See

---

[33] St. Rec. Vol. 3 of 8, Trial Court Order, p. 2, 12/3/15.

Kimmelman, 477 U.S. at. 375.  For the reasons that follow, petitioner has failed to demonstrate that a suppression motion, had it been made, would have been granted.

The Fourth Amendment to the United States Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause." U. S. Const. amend. IV.  As made clear by the Fourth Amendment, there must be probable cause to obtain a search warrant.

To support a finding of probable cause to issue a search warrant, an affiant must show "only a probability or substantial chance of criminal activity, not an actual showing of such activity." Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983).  The affidavit must also provide the judge "with sufficient reliable information from which he could reasonably conclude that the items sought in the warrant were probably at the location sought to be searched." United States v. McKinney, 758 F.2d 1036, 1042 (5th Cir. 1985) (quoting United States v. Marbury, 732 F.2d 390, 395 (5th Cir. 1984)).

Petitioner first argues that the search warrant affidavit fails to provide a nexus between his residence and the evidence sought.  A nexus may be established by direct observation or through normal inferences as to where the articles sought would be located. United States v. Freeman, 685 F.2d 942, 949 (5th Cir. 1982).  However, "[t]he affidavit need not contain information providing certainty that the objects sought will be found as a result of the search." Id. at 949 (quoting United States v. Maestas, 546 F.2d 1177, 1180 (5th Cir. 1977)).  The facts in the affidavit need only persuade a man of reasonable caution to believe that the articles sought are located in the place to be searched. Id.  The United States Fifth Circuit Court of Appeals has explained, "The justification for allowing a search of a person's residence when that person is suspected of criminal activity is

the common-sense realization that one tends to conceal fruits and instrumentalities of a crime in a place to which easy access may be had and in which privacy is nevertheless maintained.  In normal situations, few places are more convenient than one's residence for use in planning criminal activities and hiding fruits of a crime." United States v. Green, 634 F.2d 222, 226 (5th Cir.1981).

In this case, the affidavit in support of the search warrant for the residence reports the actions of the Jefferson Parish Sheriff's Office as conveyed by Detective Goff upon discovering the victim's body and leading up to the filing of the affidavit.  Detective Goff averred that Benny Ferrell identified petitioner as the person with the victim immediately prior to the murder. Detective Goff confirmed petitioner's last known address from his criminal history report.  The application sought a warrant to search the residence for firearms, ammunition, and biological evidence including blood, tissue and bloody clothing.

Both federal and Louisiana courts have found a sufficient nexus to search a defendant's residence for guns and clothing in similar circumstances.  United States v. Hamda, 647 F. App'x 1004, 1109-1110 (11th Cir. 2016) (probable cause existed to search suspected shooter's residence for gun and clothing), cert. denied, 137S.Ct. 2105 (2017); United States v. Mobely, 1:13-CR-218-CAP-LTW, 2015 WL 3488152, at *1-2 (N.D. Ga. June 1, 2015) (probable cause existed to search residence for weapons and clothing where eyewitness identified defendant as the shooter and police confirmed his place of residence); State v. Bonilla, 186 So. 3d 1242, 1261-62 (La. App. 5th Cir. 2016) (trial court did not abuse its discretion in denying a motion to suppress evidence related to a search warrant where there was a probable continuing nexus between the defendant's residence and evidence of the murder where several witnesses identified defendant as the shooter, one witness provided his address and the last known address listed in defendant's criminal history report was consistent with that address), writ denied, 206 So. 3d 881 (La. 2016), cert. denied, 137

S. Ct. 239 (2016); <u>State v. Deal</u>, 578 So. 2d 994, 996 (La. App. 4th Cir. 1991) (where witness identified defendant as the shooter thirteen months after the murder, the affidavit submitted in support of an application for a warrant to search defendant's new residence demonstrated probable cause to believe that the murder weapon would be found there); <u>State v. Chairs</u>, 466 So.2d 642, 644-45 (La. App. 5th Cir. 1985) (where victims identified defendant as the shooter and defendant advised police of his address, "[t]he facts in the affidavit in the present case, when reviewed in a common sense and nontechnical manner give rise to a reasonable belief that the defendant's usual place of residence is the logical place to search for evidence of criminal activity, including the weapon used in the commission of the crime, and the defendant's personal clothes worn during the commission of the crime."). The nexus was similarly sufficient in this case.

Petitioner also argues that the information in the affidavit was too stale to support a finding of probable cause that evidence would be located at his residence because two weeks passed between the murder and the issuance of the warrant. "Probable cause must be found to exist at the time the warrant issues." <u>United States v. Hyde</u>, 574 F.2d 856, 864 (5th Cir. 1978). If the facts alleged in the affidavit are so dated that no reasonable police officer could believe that probable cause exists, then the issuance of a search warrant violates the Fourth Amendment. <u>United States v. Kleinkauf</u>, 487 F. App'x 836, 838-39 (5th Cir. 2012). "When evaluating the staleness of information in an affidavit, this Court considers the particular facts of the case, including the nature of the unlawful activity and of the evidence sought, especially whether the evidence is of the sort that can reasonably be expected to be kept for long periods of time in the place to be searched." <u>United States v. Robinson</u>, 741 F.3d 588, 597 (5th Cir. 2014) (quoting <u>United States v. Craig</u>, 861 F.2d 818, 822-23 (5th Cir. 1988)).

In this case, the murder occurred on March 29, 2011.  Police applied for a search warrant on April 8, 2011, and the warrant was executed on April 12, 2011.  Petitioner cites no authority for his position that a warrant goes stale after such a short passage of time.  Indeed, courts have found longer passages of time in similar cases did not render information stale.  United States v. Sykes, No. 05-46, 2006 WL 3193745 (E.D. La. Nov. 2, 2006) (in finding information in an affidavit in support of a search warrant relating to a murder two months earlier was not stale, the court explained "[t]hough the Court finds no evidence of a long-standing, ongoing pattern of criminal activity, the Court does find that a handgun is evidence that could be reasonably expected to be kept at defendant's apartment for the amount of time that elapsed between the murder and the search.") (citations omitted); United States v. Jackson, No. 8:13-cr-173-T-33TBM, 2013 WL 6195773, at *10-12 (M.D. Fla. Nov. 26, 2013) (passage of more than 50 day between shooting and application for seeking search warrant for shooter's residence to search for guns and ammunition was not so great as to invalidate the warrant); United States v. Henry,  No. 2011-030 2012 WL 2886204, at *11 (D.V.I. July 15, 2012) (twenty-day period between the homicide and affidavit did not render the search warrant stale); United States v. Jefferson, 717 F.Supp.2d 790, 802 (S.D. Ohio 2010) (seventeen day lapse between homicide and search warrant did not render information in the affidavit stale).  Similarly, given the nature of evidence sought in this case, the factual allegations in the affidavit were not too stale to support a search warrant.

Even if the information in the affidavit was not sufficient to establish probable cause to search the residence, the good faith exception to the exclusionary rule adopted by the Supreme Court in United States v. Leon, 468 U.S. 897, 922-23 (1984), applies.  The Leon good faith exception provides that evidence is admissible when it is obtained by law enforcement officials acting in objectively reasonable good faith reliance upon a search warrant, even if the affidavit on

which the warrant was based was insufficient to establish probable cause.  United States v. Leon, 468 U.S. 897, 922-23 (1984); United States v. Craig, 861 F.2d 818, 821 (5th Cir. 1988).  " '[A] warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.' "  Leon, 468 U.S. at 922 (citing United States v. Ross, 456 U.S. 798, 823 n.32 (1982)).  The good faith exception does not apply where: (1) the judge issuing the warrant was misled by false information that has been shown to have been knowingly placed in the affidavit; (2) the magistrate has been shown to have wholly abandoned his or her judicial role in such a manner that "no reasonably well trained officer should rely on the warrant"; (3) the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (4) the warrant is facially insufficient in describing the place to be searched or things to be seized.  See Leon, 468 U.S. at 923 (citations omitted).

Petitioner has not established the existence of any of the four situations.  Here, there is no evidence that the allegations supporting the search warrant for the residence were false or made with reckless disregard for their veracity.  Further, there is no indication that the commissioner issuing the warrant abandoned his neutral function.  In addition, the supporting affidavit was not so lacking in indicia of probable cause to render official belief in its existence entirely.  Finally, the warrant was not facially deficient.  Rather, it specifically described the place to be searched and the evidence to be seized.  As a result, there was no basis for counsel to move to suppress the search warrant for the residence.

Petitioner also claims his counsel was ineffective for failing to challenge the search of the vehicle because the evidence was found before the search warrant for the vehicle was procured.  However, as acknowledged by the state courts, Louisiana law provides that "a warrant authorizing the search of a particularly described premises permits the search of a vehicle located on the

premises targeted for the search and subject to the authority of the warrant." State v. Washington, 90 So. 3d 1157, 1161 (La. App. 5th Cir. 2012) (citing State v. Smith, 827 So. 2d 1122, 1123 (La. 2002) (per curiam) and State v. Carter, 75 So. 3d 1, 5 (La. App. 5th Cir. 2011)); accord State v. Williams, 125 So. 3d 1195, 1197-99 (La. App. 5th Cir. 2013) (vehicle parked in driveway of house was within scope of search warrant for house).  Federal law similarly permits the search of vehicles located on the property at the time the search warrant for the residence is executed.  Wallace v. Tanner, No. 15-685, 2016 WL 6477037, at *8 (E.D. La. June 14, 2016) (search warrant for residence included vehicle on property), adopted, 2016 WL 6441260 (E.D. La. Oct. 31, 2016); United States v. Aviles-Jaimes, No. A-14-CR-300-SS-1, 2015 WL 638556, at *2 (W.D. Tex. Feb. 13, 2015) (search warrant authorizing search of residence encompassed the vehicle on the property at the time of the search).  As such, petitioner has not demonstrated a basis for counsel to move to suppress the search of the vehicle.

As the search of both the residence and the vehicle were legal, any motion to suppress would have been meritless.  As a result, counsel's failure to file such a motion cannot be considered to constitute ineffective assistance of counsel.  Evans v. Davis, 875 F.3d 210, 218 (5th Cir. 2017) ("[C]ounsel is not deficient for failing to make meritless suppression motions."); United States v. Allen, Crim. Action No. 07-161, 2010 WL 1403959, at *12 (E.D. La. Mar. 30, 2010) ("Because Allen cannot show that a motion to suppress would have succeeded, he cannot satisfy the prejudice prong of Strickland."), aff'd, 436 F. App'x 329 (5th Cir. 2011).  The state court's determination was not an unreasonable application of Strickland.

Petitioner's final claim is that his counsel was ineffective for failing to object to hearsay identification testimony of Detective Goff during the hearing on the motion to suppress identification and at trial.

33

At the motion to suppress hearing, Detective Goff testified that Benny Ferrell identified petitioner from a photographic lineup.[34]  Detective Goff also testified that, after identifying petitioner, Benny Ferrell signed the back of the petitioner's photograph.[35]

At trial, Detective Goff testified that she showed Benny Ferrell two photographic line ups and that Ferrell told her that the suspect was not in either line up.[36]  After another detective saw the sketch of the suspect, Detective Goff prepared a third lineup including petitioner's photograph and showed it to Benny Ferrell.[37]  Detective Goff testified that Benny Ferrell identified petitioner from that photographic lineup.[38]  The prosecutor asked Goff, "And I want to ask you, when he saw that lineup and he made that identification, was he confident about the identification?  Goff responded, "Yes he was – picked him almost immediately, and when I asked him if he was positive, he said [']Positive[']; when I asked him if he was a hundred percent, he said, [']A hundred percent.[']"[39]  According to Goff, Benny Ferrell then signed and dated the back of petitioner's photograph.[40]

Benny Ferrell testified that a man was with his brother on the night he was murdered.[41]  Ferrell testified that his brother told him that the man wanted to buy his boombox for some crack cocaine but Ferrell wouldn't allow it.[42]  Ferrell recalled that the man was disappointed and angry and told the victim to "come on."[43]  After Ferrell retired to his shed, he heard gun shots and went to investigate but didn't see anything.[44]  After his brother's murder, Ferrell gave a description of

---

[34] St. Rec. Vol. 4 of 8, Hearing Transcript, pp. 7-9, 2/3/12.
[35] Id., at p. 10.
[36] St. Rec. Vol. 5 of 8, Trial Transcript (con't), pp. 110-114, 1/23/13.
[37] Id., at pp. 114-15
[38] Id., at pp. 116-117.
[39] Id., at p. 117.
[40] Id., at pp. 117-118.
[41] St. Rec. Vol. 5 of 8, Trial Transcript, p. 22, 1/24/13.
[42] Id., at pp. 24-25.
[43] Id., at pp. 26-27.
[44] Id., at 28-29.

the man to police and a sketch was made.[45]  Ferrell was shown three lineups and he identified a

photograph in the third lineup and testified that he was certain that the man in the photo was the

man who was with his brother just prior to his murder.[46]

> The trial court, in rejecting this claim, found:

> Regarding the hearing on the Motion to Suppress Identification, hearsay evidence is admissible.  State v. Chisolm, 12-2278 (La. 10/22/12), 99 So.3d 48.

> Regarding the testimony presented at trial, under La. C.E. art 801(D)(1)(c), a statement is not hearsay if…the declarant testified at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is …one of identification made after perceiving the person.

> As such, the statements made by Det. Goff at trial are statutorily not hearsay. The court finds no deficiency in counsel's performance in not objecting to this testimony, as any objection would have clearly been overruled and without merit. Furthermore, petitioner fails to prove prejudice.

> Under LSA-C.Cr.P. art 930.2, the petitioner in an application for post-conviction relief shall have the burden of proving that relief should be granted.  The petitioner has not presented sufficient evidence in support of any of these claims, and thus has not met his burden.[47]

Initially, petitioner has not demonstrated that his counsel acted deficiently by failing to

object to Detective Goff's testimony at the hearing on the motion to suppress or any resulting

prejudice.  As the state court correctly noted in its opinion, there was no basis for an objection

because Louisiana law provides that "hearsay rules do not apply in hearings on motions to suppress

evidence."  State v. Shirley, 10 So.3d 224, 228 (La. 2009); State v. Turner, 13 So.3d 695, 703-704

(La. App. 5th Cir. 2009) ("[H]earsay testimony is admissible in a motion to suppress hearing.").

Therefore, any objection on hearsay grounds would be meritless, and it is clear that the "[f]ailure

to raise meritless objections is not ineffective lawyering; it is the very opposite."  Clark v. Collins,

19 F.3d 959, 966 (5th Cir. 1994); accord United States v. Kimler, 167 F.3d 889, 893 (5th Cir.

1999) ("An attorney's failure to raise a meritless argument ... cannot form the basis of a successful

---

[45] Id., at pp. 29-32.
[46] Id., at pp. 32-35.
[47] St. Rec. Vol. 3 of 8,Trial Court Order, 12/3/15.

ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue."); Smith v. Puckett, 907 F.2d 581, 585 n.6 (5th Cir. 1990) ("Counsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim."); see also, Koch v. Puckett, 907 F.2d 524, 530 (5th Cir. 1990) ("Counsel is not required to make futile motions or objections.").

It is unclear whether petitioner contends that counsel was ineffective for failing to object to Detective Goff's testimony on the ground that it violated his Confrontation Clause rights under Crawford v. Washington, 541 U.S. 36 (2004).[48]  If so, that argument fares no better.  Crawford did not involve a pretrial suppression hearing, and there is no Supreme Court precedent holding that the Confrontation Clause applies in pretrial suppression hearings[49] or that counsel can be

---

[48] Crawford provides that the Confrontation Clause prohibits admission of "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination."  Crawford v. Washington, 541 U.S. 36, 53–54 (2004).

[49] As the United States Tenth Circuit Court of Appeals has noted: "There is no binding precedent from the Supreme Court or this court concerning whether Crawford applies to pretrial suppression hearings."  United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009).  The Tenth Circuit went on to note:

> To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia.  See United States v. Miramonted, 365 F.3d 902, 904 (10th Cir. 2004) (decided after Crawford, but without citing it, holding that "hearsay [testimony] is admissible at a hearing on a motion to suppress and should have been considered by the district court"); cf. United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir. 2006) ("Crawford concerned the use of testimonial hearsay statements at trial and does not speak to whether it is appropriate for a court to rely on hearsay statements at a sentencing hearing." (emphasis added)).

> Moreover, apparently few federal courts have squarely addressed the issue.  See, e.g., United States v. Morgan, 505 F.3d 332, 338 (5th Cir. 2007) ("[T]he Fifth Circuit has not decided whether Crawford applies to pretrial proceedings and determinations...."); Francischelli v. Potter, No. 1:03-CV-6091-ENV, 2007 WL 776760, at * 10 (E.D.N.Y. Mar. 12, 2007) ("[T]he Court can find no authority applying Crawford to a suppression hearing.").  And Mr. Garcia can find little solace in the rulings of those courts that have definitively spoken.  See, e.g., Washburn v. United States, No. 3:05-CV-774 RM, 2006 WL 3715393, at *4 (N.D. Ind. Dec. 14, 2006) (noting that Crawford's applicability to pretrial suppression hearings is "an issue of first impression" in the Seventh Circuit and finding that defendant's "reliance on Crawford is misplaced"); United States v. Thompson, No. 4:05CR00161 HEA(AGF), 2005 WL 3050634, at *6 (E.D. Mo. Nov. 14, 2005) (rejecting Crawford's alleged applicability to a pretrial suppression hearing, noting "Crawford does not change the long-standing prior precedent that permits the use of hearsay in preliminary proceedings dealing with the admissibility of evidence").

Garcia, 324 F. App'x at 708-09.

ineffective for failing to raise a Confrontation Clause objection in such a hearing. As a result, there is no basis for finding that the state court decision denying the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). As the United States Supreme Court has explained, where its "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted). Cf. United States *ex rel*. Thomas v. Gaetz, 633 F. Supp. 2d 645, 657 (N.D. Ill. 2009) ("Because the Supreme Court has not held that Crawford applies to pre-trial hearings, it cannot be said that the appellate court's decision was contrary to, or an unreasonable applicable of clearly established federal law.").

Petitioner's claim relating to his counsel's failure to object to Detective Goff's trial testimony also lacks merit. Louisiana law excepts this type of identification evidence from its hearsay rules even if it raises inferences for the jury. " '[T]his permissible inference does not make the statement hearsay.' [State v. Bagneris, 804 So.2d 831, 834 (La. App. 4th Cir. 2001)]. A witness' act of selecting a picture of a suspect from a photographic lineup presented by police is not hearsay because it constitutes a statement of identification as contemplated by La. C.E. art. 801(D)(1)(c) ...." State v. Jackson, 115 So.3d 1155, 1164-65 (La. App. 4th Cir. 2013). This rule is bolstered by state law provisions, in compliance with Crawford, that exempt from hearsay the use of out-of-court statements and identifications when the declarant testifies and is available for cross-examination. Jackson, 115 So.3d at 1165 (citing La. Code Evid. art. 801(D)(1)(c)). The Louisiana Supreme Court has held that "[i]f at trial the eyewitness fails to remember or denies that he made the identification, the previous statements of the eyewitness can be proved by the

testimony of a person to whom the statement was made, and the statement can be given substantive effect." State v. Johnson, 774 So.2d 79, 80 (La. 2000) (citing United States v. Brink, 39 F.3d 419, 426 (3d Cir. 1994)); see State v. Roe, 151 So.3d 838, 860 (La. App. 4th Cir. 2014) (officer's testimony as to witness's identification of defendant in a photographic lineup is not hearsay) (citing State v. Duncan, 91 So.3d 504, 516-17 (La. App. 4th Cir. 2012); State v. Richards, 47 So.3d 598, 603 (La. App. 4th Cir. 2010) (officer's testimony regarding victim's identification of defendant in a photographic lineup not hearsay even when victim did not testify regarding her previous identification of defendant at trial) (citing State v. Stokes, 829 So.2d 1009 (La. 2002) ("Such a statement may be used assertively, as substantive evidence of guilt, and may be established through the testimony of one to whom the statement was made. This is so even if the witness denies making an identification or fails or is unable to make an in-court identification.")).

In this case, neither Louisiana law nor Crawford provided any basis for petitioner's counsel to object to Detective Goff's trial testimony regarding the photographic line-up. Benny Ferrell confirmed the photograph he selected. Detective Goff and Benny Ferrell were present at trial and both were subject to cross-examination by defense counsel regarding the out-of-court identification. Because petitioner has not established that the testimony was improper, he cannot show that counsel was ineffective for failing to object to its admission. As already explained, trial counsel's performance can never be deficient for failing to make a specious objection. See Clark, 19 F.3d at 966; Smith, 907 F.2d at 585 n. 6.

Second, even if testimony had been improper, federal law holds that a decision of counsel to forgo a particular objection is generally one of trial strategy, and, as such, is normally insufficient to support an ineffective assistance claim. See, e.g., Wolfe v. Cain, Civ. Action No. 11–2906, 2012 WL 6839718, at *9 (E.D. La. May 14, 2012), adopted, 2013 WL 139871 (E.D. La.

Jan. 10, 2013); Rios-Delgado v. United States, 117 F.Supp.2d 581, 589 (W.D. Tex. 2000) ("Generally speaking, a failure to object, standing alone, does not rise to the level of constitutionally deficient performance.  In cases where an accused complains that counsel was ineffective because he did not object to something ..., the courts grant significant deference, as such actions fall squarely within the ambit of trial strategy.").  Such deference is appropriate here where there simply is no reasonable probability that the result of the proceeding would have been different if defense counsel had objected to the Detective Goff's testimony related to Benny Ferrell's identification of petitioner, and therefore petitioner cannot show the prejudice required to prevail on his ineffective assistance of counsel claim.

For all of these reasons, it is clear that petitioner has not demonstrated that the state court's decision rejecting his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  Accordingly, utilizing the AEDPA's doubly deferential standards of review applicable to such claims, this Court denies relief.

### RECOMMENDATION

It is therefore **RECOMMENDED** that the federal application for habeas corpus relief filed by Cody Smoot be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n,

79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[50]

New Orleans, Louisiana, this seventeenth day of May, 2018.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[50] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.